429 F.2d 348
 Fed. Sec. L. Rep. P 92,625
M. P. GILBERT, M. J. Lebsack, and A. R. Lebsack and M. J.
Lebsack, a partnership d/b/a Lebsack Development
Company, Appellants,
v.
Richard P. NIXON, a/k/a R. P. NIXON, Appellee.
 No. 68-68.
 United States Court of Appeals, Tenth Circuit.
 April 3, 1970, As Amended on Denial of Rehearing June 10, 1970.
 
 Gerald Sawatzky, Wichita, Kan., for appellants.
 Marvin E. Thompson, Russell, Kan., for appellee.
 Before HILL, Circuit Judge, FAHY,* Senior Circuit Judge and HOLLOWAY, Circuit Judge.
 FAHY, Senior Circuit Judge.
 
 
 1
 In a suit filed in the United States District Court for the District of Kansas, plaintiffs, now appellants, sought to recover from appellee, defendant in the District Court, damages including some $190,000.00, alleged to be amounts invested by them in the purchase from appellee of fractional interests in thirteen oil and gas leases. Appellants base their claim on alleged violations by appellee of the federal and Kansas securities statutes. After a lengthy trial without a jury the court entered Findings of Fact and Conclusions of Law upon the basis of which judgment was rendered for appellee in the main case. Appellants, however, received a judgment in the sum of $5,657.11, representing their share of certain discounts and oil payments for which appellee had not accounted. We affirm that judgment for appellants. As to the judgment for appellee we affirm in part, remand in part, and reverse in part, as to be explained.
 
 
 2
 Appellant M. J. Lebsack[1] is a graduate petroleum engineer with offices in Denver, Colorado, experienced in the purchase and sale of fractional working interests in oil and gas properties in the mid-continent fields. His principal activity since 1956 has been the supervision of the oil and gas investments of appellants M. P. Gilbert and her husband, B. D. Gilbert, the manager of her investments. Both Gilberts were residents of Connecticut. Appellee R. P. Nixon is a graduate petroleum geologist generally engaged as a consulting geologist and in drilling and operating wells on oil and gas leases in the mid-continent fields. The transactions from which this suit arose began in May, 1960, but the parties had been associated in similar ventures commencing in 1957. From May, 1960, through February, 1963, the Gilberts, acting for purposes of this decision through their agent Lebsack,[2] purchased from appellee Nixon fractional interests in sixteen oil and gas leases located in four Kansas Counties. Thirteen of these fractional interests are the subject of this suit.
 
 
 3
 Nixon would acquire an oil and gas lease from a landowner. He would then submit a proposal to Lebsack for the purchase by appellants of a fractional working interest in the lease. Accompanying the proposal would be a geological map derived from a base map of the area and upon prior drilling activity as evidenced by available well completion cards. The geological map represented Nixon's opinion of the sub-surface contours of the geological formations giving a significant indication of possible productivity at the proposed site. Nixon would also transmit to Lebsack production information on nearby wells, his drilling plans, and his geological opinion as to the likelihood of encountering oil. Lebsack would evaluate the proposal from the data submitted by Nixon and, at times, from other available information. He then sketched his own geological map and submitted this to the Gilberts along with his evaluation of the Nixon proposal. They then advised Lebsack of their desire to participate, and to what extent, and Lebsack would execute a letter agreement in a form furnished by Nixon.[3]
 
 
 4
 The drilling, equipping and operating of the leases were supervised by Nixon. Appellants were kept advised by Lebsack primarily on the basis of communications between Nixon and Lebsack. Nixon billed Lebsack for appellants' proportionate share of the drilling costs upon completion of the drilling. If Nixon determined from drilling tests to install production equipment the Gilberts were billed through Lebsack on a monthly basis for their fractional share of operating costs. Fractional payments for oil produced were received by appellants directly from the purchasing company.
 
 
 5
 Production casing was set and some production obtained or attempted from wells on leases known as Bowlby, Ewing 'B', Ginther, Driscoll, Herber, and Pendergast, all of which fractional interests were purchased by the Gilberts under procedure conforming generally with that above outlined. The Driscoll, Herber and Pendergast interests were soon abandoned as non-commercial. The Bowlby, Ewing 'B' and Ginther leases, marginal producers, were sold at appellants' loss. Purchases were also made by the Gilberts from appellee Nixon of fractional interests in leases known as Steinert, Ewing 'A', Hlad, Brungardt 'C', Teeters, Snapp and Vogel. Wells on all these last named leases were plugged and abandoned as dry holes.
 
 
 6
 Appellants' suit, filed in June, 1964, alleged violations of the Federal[4] and State[5] Securities Acts and common law fraud,[6] with respect to the interest purchased by them in the thirteen oil and gas leases mentioned. The damages claimed are roughly the amounts invested by appellants with appellee in connection with the interests they purchased.[7]
 
 
 7
 The District Court held, in part, as follows: (1) the fractional interests were 'securities' within the meaning of 15 U.S.C. 77b(1);[8] (2) offers or sales of fractional interests in oil and gas leases to persons such as appellants, knowledgable and experienced in such transactions, with whom the offeror had a long standing association in other leases were 'transactions by an issuer not involving any public offering,' 15 U.S.C. 77d(2), and thus were exempt from the civil liability provisions of 15 U.S.C. 77l(1);[9] (3) there is no need under 15 U.S.C. 77l(2) or K.S.A. 17-1268(a) for the seller of a fractional interest to state every fact which, if known to the prospective purchaser, might tend to influence his decision; (4) in cases where untrue statements were made or where there were omissions to state facts, the statements or omissions were 'not material, and also * * * defendant has sustained his burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.' Defining materiality the court stated (5):
 
 
 8
 Whether representations or omissions of fact are material depends upon the subject matter of the transaction and the relationship and knowledge of the parties. Such representations or omissions are material when it relates to some matter which is so substantial and important as to influence the party to whom it is made and if the transaction would not have occurred in their absence; but conversely, the representation or omission is immaterial if the transaction would have occurred in the absence of such representations or omissions, or if the representations or omissions causes no injury, or if they were mere expressions of opinion.
 
 
 9
 The court also ruled that (6) any action plaintiffs may have remaining against defendant, or conversely, would be an action for accounting and/or breach of contract. Other findings and holdings of the court, to the extent deemed necessary, are considered in relation to the subject to which directed in the course of this opinion.
 
 
 10
 We agree with the District Court that the fractional interests in this suit were securities within the meaning of 15 U.S.C. 77b(1) of the 1933 Act (as well as 15 U.S.C. 78c(10) of the 1934 Act and K.S.A. 17-1252(j)). Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959). We also agree with the District Court that the fractional interests were 'transactions by an issuer not involving any public offering,' see, 15 U.S.C. 77d(2), Woodward v. Wright, supra; Garfield v. Strain, 320 F.2d 116 (10th Cir. 1963), and SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), from which it follows that they were exempt from the registration requirements of 15 U.S.C. 77e. Consequently, there is no liability under the provisions of 15 U.S.C. 77l(1).
 
 
 11
 The statutory foundation upon which appellants rest their case is built primarily upon Section 10(b), 15 U.S.C. 78j(b)[10] of the Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. 240.10B-5, issued thereunder, which provides in clause (2) as follows:
 
 
 12
 It shall be unlawful for any person * * * (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading * * * in connection with the purchase or sale of any security.
 
 
 13
 While appellants in their brief on appeal consider liability under Rule 10b-5 to be 'most appropriate' they also pursue remedies under, and the trial court appears to have based its decision upon, claimed violations of Section 12(2) of the Securities Act of 1933, 15 U.S.C. 77l(2), which is comparable to Section 17-1268 of the Kansas Securities Act. Section 12(2) provides that a purchaser may recover the consideration paid for a security, less the amount of any income received therefrom, or damages if he no longer owns the security, if the seller offers a prospectus which includes:
 
 
 14
 an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.
 
 
 15
 We now consider whether the trial court, in denying recovery by appellants, applied to the evidence the correct legal principles. We recognize that purchasers of securities have an implied private action for damages under Rule 10b-5[11] in addition to a remedy under Section 12(2) and that the two provisions, as interpreted, are not altogether consistent with each other.[12] Had appellants invoked Section 12(2) alone our task in formulating the proper legal standards for recovery would have been simplified. We note, however, that a private action under Rule 10b-5 originated in the need for a sellers remedy where none had otherwise been provided.[13] Once a remedy was implied for the seller, it was extended to include the buyer even though relief was already available to him under Section 12(2). Since in this case recovery is sought under both provisions, we resolve any conflict between them in favor of Section 12(2), where the statutory remedy is explicit.[14]
 
 
 16
 With the foregoing considerations in mind, we turn first to the requirement that the alleged misrepresentations or omissions must be material. No conflict arises in the definition of this term. In the leading case of List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), the basic test of materiality under Section 10(b) and Rule 10b-5 is stated to be:
 
 
 17
 whether 'a reasonable man would attach importance (to the fact misrepresented) in determining his choice of action in the transaction in question.' Restatement, Torts, 538(2)(a).[15] Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1966), adopts the same definition but in terms of facts not disclosed. Likewise in Kardon v. Nat'l Gypsum Co., 73 F.Supp. 798, 800 (E.D.Pa.1947), materiality is said to be that 'which would materially affect the judgment of the other party to the transaction,' and in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968), cert. denied sub nom., Coates & Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), it was said that a material fact 'encompasses any fact '* * * which in reasonable and objective contemplation might affect the value of the corporation's stock or securities," quoting from Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963), and List v. Fashion Park, Inc., supra, 340 F.2d at 462. Materiality is similarly defined under Section 12(2), see DeMarco v. Edens, 390 F.2d 836, 840 (2d Cir. 1968), and Johns Hopkins University v. Hutton, 297 F.Supp. 1165, 1218 (D.Md.1968), where the test is stated as 'matters as to which an average prudent investor ought reasonably to be informed * * *.'
 
 
 18
 From the above we conclude that in the present case an omission or misrepresentation of fact was material if, considering its full context, including the subject matter and the relationship of the parties, the misrepresentation or omission was of a fact which, considering appellants as reasonable or prudent investors, would affect or influence them in determining whether to buy the fractional interests.
 
 
 19
 The misrepresentation or omission must be misleading. This may appear from its nature considered alone, or because it is not explained in a way to obviate its otherwise misleading character.
 
 
 20
 The terms of Section 12(2) provide that knowledge of the truth on the part of the person addressed also relieves the misrepresentation or omission of materiality it otherwise might have had; and the buyer-plaintiff has the burden of proving his excusable ignorance. Woodward v. Wright,supra, 266 F.2d at 116. On the other hand, the purchaser does not have to prove that he could not have discovered the falsity upon reasonable investigation. Murphy v. Cady, 30 F.Supp. 466, 469 (D.Me.1939), aff'd sub nom. Cady v. Murphy, 113 F.2d 988 (1st Cir.), cert. denied, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940); Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956); Johns Hopkins University v. Hutton, supra, 297 F.Supp. at 1221.
 
 
 21
 Morever, reliance upon a material misrepresentation or omission is not a condition for recovery under Section 12(2), Woodward v. Wright,supra, 266 F.2d at 116; DeMarco v. Edens, supra, 390 F.2d at 841; Johns Hopkins University v. Hutton, supra, 297 F.Supp. at 1222. While the purchaser has been required to prove his reliance in an action under 10b-5 by some courts,[16] we do not place the burden on appellants in this case as we have decided that in such circumstances the rules of Section 12(2) should prevail. We held in Woodward v. Wright, supra, 266 F.2d at 116, that 'to say that purchaser reliance is a prerequisite to seller liability is to import something into the statute which is not there.' We do not think the result should be otherwise because appellants sought recovery under 10b-5 as well as Section 12(2).
 
 
 22
 One is not to be held liable, however, because of his misleading misrepresentation or omission of material fact, the truth of the matter being unknown known to the purchaser, if the party responsible for the misrepresentation or omission sustains the burden of proving that he did not know, and in the exercise of reasonable care could not have known that it was a misrepresentation or omission. Once again, as in the case of reliance, the seller's burden of proving lack of scienter, made necessary by the specific provisions of Section 12(2), see, Woodward v. Wright, supra, 266 F.2d at 116; Wilko v. Swan, 346 U.S. 427, 431, 74 S.Ct. 182, 98 L.Ed. 168 (1953), should not be affected in this case by different requirements in this regard under 10b-5.[17]
 
 
 23
 The above we consider to be the basic standards to be applied in this case in determining injury and the consequent right to recover. It is seen that recovery does not depend, as the trial court held, upon proof that 'the transaction would not have occurred' absent the representation or omission or, conversely, 'would have occurred' in its absence. We think this sine qua non is more favorable to appellee than the law permits.[18] However, the failure of the trial court to follow the standard of materiality and related matters which we have described does not necessarily require a remand with respect to all transactions involved, as we shall see when we come to discuss separately those which require separate treatment.
 
 
 24
 Before discussing the transactions requiring separate treatment we consider one contention of appellants which applies to all thirteen fractionalinterest transactions. The contention is that Nixon represented that all moneys invested by appellants would be used for operations on the lease interests without additional compensation to Nixon, that is, that billings would be at cost and all discounts would be 'passed on.' Appellants contend, however, that Nixon as a practice retained out of moneys invested by appellants substantial discounts, ranging from 15% To 25%, granted by some of his suppliers, and that on some of the leases he used old equipment for which he billed appellants at excessive rates. These and other similar misrepresentations, it is claimed, materially affected the entire course of dealings between the parties and in themselves justify the return of the consideration paid by appellants for all thirteen lease interests.
 
 
 25
 It is undeniable that the earlier of the 'letter contracts' included a provision that appellants would be charged their proportionate part of 'any and all drilling costs to the point of running production casing' and that the earlier billing invoices sent by Nixon to Lebsack included a notation that all allowable discounts would be 'passed on.' It is also true, as appellee confessed, followed by a tender of restitution, that, though he did pass on to appellants the greater part of the ordinary trade discounts, others growing out of special relationships were not passed on. He has undertaken without contest in the litigation to reimburse appellants for their proportionate share of the discounts of both categories which were not passed on, though some disagreement appears as to the amounts.[19]
 
 
 26
 The trial court, as we have said, entered judgment in favor of appellants in the sum of $5,657.11 representing Nixon's confession of judgment as to the withheld discounts,[20] but declined to grant further relief, explaining in its Memorandum Opinion:
 
 
 27
 Because of the partnership relationship between these parties the defendant is required to pass on the discounts to his mining partners and has frankly done so in his motion in confession of judgment.
 
 
 28
 It is the Court's opinion that the failure to pass on such discounts does not constitute a representation as of the date of the letter agreements of a past or existing fact. None of these discounts were, in the Court's opinion, material to the plaintiffs' entering or accepting participation in any of the leasehold projects.
 
 
 29
 The court did not reach the issue of the materiality of the excessive billings for equipment as it determined that charges by appellee were at cost and fair market value.
 
 
 30
 We agree with the court that Nixon's failure to pass on discounts did not constitute a misrepresentation of a material fact warranting recovery of the total amounts paid in connection with the thirteen leases, and hold the same to be true with respect to the excessive billings. To hold otherwise would be in substance to penalize appellee for wrongful conduct which was not significantly related to the basis on which the transactions were consummated, as Lebsack himself testified. Nor do we think Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965), relied upon by appellants, requires a different result, as that case dealt with a quite different factual situation.
 
 
 31
 We do not find it necessary, however, in agreeing with the court on this portion of the case to agree also with its characterization of the relationship of the parties as joint venturers or mining partners. Whatever the source of Nixon's obligation to return secret discounts he has confessed the judgment which has been granted to appellants and there is no claim on appeal that the court erred in doing so. Nor are we able to sustain the court's finding that appellants were charged at fair market price for drilling equipment in light of the evidence in the record of inflated and excessive billings far above market value. Thus our decision favorable to appellee based on the Securities Act is without prejudice to any claim appellants might assert for excessive charges.
 
 
 32
 Appellants acknowledge that aside from discounts and excessive billings, with an exception to be stated, the evidence supports the court's findings favorable to appellee with respect to the fractional interests known as Bowlby, Snapp, Hlad, Vogel, Brungardt 'C', and Steinert. The exception is that the purchases of these interests were influenced by misleading statements not directly concerning them but by reports of the results of the Pendergast, Ewing 'B', Herber, Driscoll, and Ginther leases. We shall separately consider these leases, and, also, Ewing 'A' and Teeters, but dispose now of this exception to appellants' concession regarding the six interests referred to. We conclude that appellants must establish more than a general atmosphere of favorable but misleading reports in order to recover their consideration for leases individually submitted on the basis of data directly relating to them when there is found to be no direct geological connection between the leases subject to false reports and those for which recovery is sought. Such vague generalities do not amount to a showing of materiality as we have defined the term. We thus affirm the trial court's findings as to the fractional interests referred to as Bowlby, Snapp, Hlad, Vogel, Brungardt 'C' and Steinert. This leaves for consideration those now to be separately discussed.
 
 
 33
 Pendergast Lease-- NE/4 Section 27-19-15 Barton County, Kansas
 
 
 34
 The principal problem about this lease, which produced some oil but was plugged in October, 1961, centers on the erroneous location of a dry hole on the plat submitted by appellee, placing it one-half mile east of its actual location. Appellants claim that if properly located on the plat it would have required a substantial change in the location and depth of appellee's structural subsea contour lines as drawn on a map sent to Lebsack, and would have indicated that the proposed drill site was unfavorable. The court, however, on the basis of all the testimony regarding this error found that his incorrect location made the proposed site a less likely drilling venture than if the location of the dry hole had been shown correctly. There was a difference of opinion about this, with Lebsack in disagreement; but we think the court's conclusion is not required to be disturbed under the standard of materiality we accept. True it is that the testimony upon which the court relied conflicted with the opinion which might have been reached on the basis of Mr. Lebsack's testimony, but on the whole case, including the trial court's view of the relative merits of the witnesses' testimony, we do not feel justified in disturbing the court's conclusion. The evidence was strongly to the effect that the error was not material. Accordingly we affirm the trial court's finding on this aspect of the case.
 
 
 35
 Ewing 'A' Lease-- NE/4 Section 35-19-15, Barton County, Kansas
 
 
 36
 Ewing 'B' Lease-- SW/4 Section 36-19-15, Barton County, Kansas
 
 
 37
 Nixon submitted his prospectus for these leases September 12, 1961. In doing so he represented that he 'recently completed a good Reagan Sand well in the NW NE SE of Sec. 35' and that 'this well also has four Kansas City zones behind the pipe.'[21] Appellant Lebsack forwarded the material to the Gilbert appellants September 14, 1961, stating that the foregoing representations were the reason for recommending these two lease interests. The letter agreements on the leases were accepted by Lebsack on October 4, 1961. As indicated on the plat or geological map sent by Nixon to Lebsack, the Regan Sand well referred to was a direct offset[22] to both of the proposed locations on Ewing 'A' and Ewing 'B.' The Ewing 'A' well never produced and was plugged as a dry hole. The Ewing 'B' well produced oil, but accompanied by a high percentage of water. Appellants sold their interest in the lease at a loss in a partition action.
 
 
 38
 The trial court found that the statement regarding the recent completion of a good Reagan Sand well was true in that the well had an initial state tested potential of 52.92 barrels of oil a day as of July 13, 1961. Aside from other questionable representations relating to these leases,[23] it appears from uncontradicted testimony that on September 12, when the Ewing proposals were submitted for appellants' consideration, production of the Reagan Sand well had declined to approximately 10 barrels a day and therefore was not a commercial well at that time.
 
 
 39
 Putting aside the issue of reliance, which in any event is supported by the record, we hold that the misrepresentations were material under the standard we have determined to be proper in this case. The record leaves no doubt that the Reagan Sand well representation was used by Nixon as a selling point and would have been considered as such by a reasonable and prudent investor. As the representation was misleading at the time it was made, appellants are entitled to recover their losses on the Ewing 'A' and Ewing 'B' leases. In so concluding we fail to find support, in relation to these particular lease interests, for the District Court's general conclusion that in all cases of material misrepresentations, Nixon sustained his burden of proving lack of knowledge. Nor is there any evidence that appellants were aware of the untruths or omissions when the representations were made or when the leases were purchased. We therefore find it unnecessary to remand this part of the case for further findings by the District Court.
 
 
 40
 Teeters Lease-- NW/4 Section 1-20-15, Barton County, Kansas
 
 
 41
 In January 1962 Lebsack received a prospectus and a geological map describing the Teeters lease. The map indicates that the proposed Teeters drilling site was to be located as a direct southern offset to the Ewing 'B' lease and within the same general structural formation as the Ewing 'A' well. In his prospectus Nixon represented that '2 wells in the SE/4 of Sec. 35 have recovered over 20,000 barrels.' The wells thus referred to include what was described in relation to the Ewing 'A' and 'B' interests as a 'good Reagan Sand well.' For this reason appellants claim our disposition of the Teeters lease should follow that of the Ewing leases. The prospectus also points out that 'the high well in the SW/4 of Sec. 36 was completed in December, 1961.' The reference here is to the Ewing 'B' well, which appellants contend was producing 90% Water at that time. It is said that this information was material but was not disclosed by Nixon.
 
 
 42
 Lebsack accepted a letter agreement for the Teeters lease on March 22, 1962. The well was drilled in April, 1962, but later was plugged as a dry hole. The court found that the appellants knew or should have known as early as January 10, 1962, that the Ewing 'B' well was making salt water and that they received further information to that effect about February 7 and March 7, 1962. The court made no findings on the Reagan Sand well, as it had held, when discussing the Ewing leases, that the well was a good well.
 
 
 43
 In our consideration of Ewing 'A' and Ewing 'B' we held that references to the Reagan Sand well constituted material misrepresentations for which Nixon should incur liability without a remand. The relation of this misrepresentation to the Teeters lease, however, is not so clear as its relation to the Ewing leases. We accordingly remand for reconsideration by the District Court the question of possible recovery by appellants using the standards we have set forth in this opinion, including that governing materiality. On remand the court might well give consideration to the fact that in October, 1961, the Ewing 'A' well was found to be dry. This was five months before the Teeters transaction, raising the question whether the unreliability of the Reagan Sand well representations might have been known to appellants when the Teeters interest was acquired.
 
 
 44
 We remand also for further findings by the District Court on the issue of salt water production on Ewing 'B' as it relates to appellants' purchase of Teeters. Appellants admit that at the time of the Teeters transaction they were aware of the fact that the Ewing 'B' well was producing salt water, but it is claimed that it is normal for good commercial wells to produce some salt water. A well that produces 90% Water, on the other hand, is said by appellants to be a non-commercial well and it is alleged that Nixon should have disclosed this material fact when he submitted proposals for the offsetting Teeters. A remand is necessary to determine what information, in addition to that noted by the trial court, was conveyed to Lebsack by Nixon by way, for example, of production reports on Ewing 'B' which might have suggested to the appellants that Ewing 'B' was or was not commercial, and whether from all the information disclosed to Lebsack prior to the Teeters transaction, the appellants should be charged with knowledge of the high degree of salt water production. In making such a determination the court should keep in mind that appellants cannot be charged with the obligation to make independent investigations to verify the accuracy of Nixon's representations. On the other hand, if the appellants were not led to believe that the Ewing 'B' lease was commercial but instead were made aware of salt water production, it is for the court to determine whether or not they had sufficient knowledge to preclude recovery for material non-disclosures.
 
 
 45
 Herber Lease-- SE/4 Section 19-15-11, Russell County, Kansas
 
 
 46
 Nixon submitted a prospectus and a geological map for this lease in November, 1961, and a letter agreement was accepted by Lebsack in March, 1962. The lease interest is geologically separated from those discussed previously. In his map and prospectus Nixon pointed out that there were two producing wells offsetting the proposed drill site to the southwest with subsea Lansing depths of -1121 and -1128. It is appellants' position that in order for the Herber lease to be a favorable purchase it would be necessary for the Lansing structure to which the well was to be drilled to be similar to or higher than the producing wells.[24] There was a dry hole, which we assume, as appellants claim, was 'the only structural control point'[25] offsetting the proposed Herber site to the north, and was shown by appellee to have a Lansing depth of -1128. Nixon's map thus indicated that the Herber well would be drilled between the dry well to the north and the two producers to the south, and that its Lansing depth would be structurally higher than both. The fact was that the dry hole to the north had a Lansing top of -1141 or -1144. The Herber well, when drilled, was found to have a Lansing top of -1139 and was eventually plugged as a nonproducer.
 
 
 47
 Whether there was actional misrepresentation or omission in connection with appellants' decision to go forward with the purchase of this lease turns upon whether Nixon should be held responsible for not discovering the correct depth of the dry hole to the north of the Herber well and whether the misinformation conveyed was material. The District Court found, with support in the evidence, that Nixon had a well card from a reporting service which indicated that the Lansing top was -1128 as he had represented to Lebsack on the map. The court similarly found that when appellee submitted the proposal his base map of Russell County showed the 'Lansing-Kansas City at the location of such dry hole to be -1128, and defendant did not know the same to be -1141.' There is no specific finding, however, that appellee could not reasonably have ascertained that his representation about the dry hole was incorrect. We note that there is evidence in the record that the correct information was known to the company which drilled the Herber well and that if appellee had checked available sources he could have discovered the correct top. Nixon testified that he had no reason to doubt the accuracy of his information and thus did not verify it as he could have. Despite the trial court's finding that in all instances appellee has sustained the burden of proof that he did not know and in the exercise of reasonable care could not have known, of any untruths or omissions, we remand for a specific finding on this point in light of the foregoing, and if it is determined that Nixon has not sustained his burden, whether his misrepresentations were material under the standards we have held to be proper.
 
 
 48
 Driscoll Lease-- NE/4 Section 30-15-11, Russell County, Kansas
 
 
 49
 Nixon sent a prospectus and a map in connection with this lease on June 8, 1962. Reference was made to the Driscoll Pool to the south of the proposed well together with the comment that 'I believe these wells to be on the edge of the main structure as you can see from my subsurface plat.' There is no dispute about these representations. However, the prospectus also stated that the Driscoll lease is 'directly south of our Warta and Herber leases and appears to have considerable merit.' Appellants' contention is that Nixon used the Herber lease as a selling point at the very time he was giving appellants false reports on the production of that lease. The trial court disagreed. It ruled that the representations about the drilling results of Herber were true, but in any event, the Driscoll lease 'was not an offsetting well to the Herber' and this fact made any representations immaterial.
 
 
 50
 The evidence in the record does not appear to support the court's finding. Lebsack testified that 'The information that we had on the Herber very definitely induced me as to whether I would recommend to the Gilberts to participate in the Driscoll.' The reference to Herber was to a report by appellee May 15, 1962, prior to the Driscoll purchase date of July 19, 1962, that the Herber well had a test of 30 barrels a day. During the trial Nixon was asked whether he knew 'the plaintiffs were relying on an important and material degree on the situation on the Herber and Warta leases in agreeing to purchase' the Driscoll fractional interests. Appellee replied, 'They may have been relying to some degree on this well, but the #1 Herber was a weak well from its outset and we all knew it,' although he admitted that a 30 barrel well was not a weak well and he could not specify any particular report sent to appellants after the report of May 15 and before the purchase of Driscoll.
 
 
 51
 We have already held that appellants do not have the burden of proving reliance as a condition of recovery. However, evidence of reliance, when presented, does bear upon the issue of materiality if that reliance is determined to be reasonable. See, SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 849-851. We think the trial court should not have ended its inquiry into materiality when it found that the Driscoll and Herber wells are 'obviously located in separated geological structures.' Accordingly we remand for the court to determine first whether Nixon's failure to keep appellants informed on the progress of Herber was, under the circumstances of the Driscoll sale, misleading, and if so, whether the reliance upon the misleading reports was reasonable enough to make them material.
 
 Ginther Lease-- NE/4 Section 19-12-15
 
 52
 This interest was offered to appellee together with the Driscoll lease on June 8, 1962. The Ginther lease, as appellants' brief states, offset 'an excellent producing lease called the Gibbs lease, on which defendant was operator and in which Mrs. Gilbert (plaintiff) owned a small fractional interest.' Appellants claim with respect to the lease that appellee failed to show on his contour map an abandoned producer which was plugged an non-commercial after production had been attempted for two years in 1959. The dry well was located 600 feet east of the proposed Ginther site and 330 feet west of the productive Gibbs lease. The trial court found as follows:
 
 
 53
 For full disclosure this information should have been shown for what it was worth. The materiality of its omission is speculative and hence must be considered immaterial in light of the information shown on the geological map and in the prospectus at the time of its submission and in light of the circumstances under which the parties determined to undertake the drilling of the Ginther well, i.e., an abundance of producing wells in the area in adjoining quarter sections, apparently probable and accurate contouring data, and the existence of $2,000.00 dry hole money.
 
 
 54
 There is no testimony from which it can be found that appellee was not aware of this abandoned well, or should not have been. Moreover the references to the record contained in his brief cited in support of the trial court's finding of immateriality do not necessarily support the court's position under the standard of materiality to which we adhere. We therefore feel obliged to remand this part of the case also for reconsideration under the test of materiality we have set out in this opinion.
 
 
 55
 It will be seen from the foregoing that we affirm the District Court in its decision insofar as appellants rest their appeal upon their broad claims of misrepresentation regarding excessive charges, discounts, and misleading atmosphere caused by allegedly false reports. We also affirm the District Court's money judgment based on appellee's confession of liability for restitution of appellants' share of discounts and oil credits. With regard to the lease interests individually considered in this opinion we affirm the District Court's denial of recovery of appellants' losses on the Pendergast lease but reverse and award judgment in favor of appellants for the amounts found as their loss with respect to the Ewing 'A' and 'B' fractional interests. We remand for reconsideration by the District Court the issues of recovery or not by appellants with respect to the amounts claimed as a consequence of their purchase of fractional interests in the leases known as Teeters, Herber, Driscoll and Ginther.
 
 
 56
 While we have attached considerable emphasis in our opinion to the standard of materiality to be applied to the transactions to be reconsidered on the remand, the trial court when applying the standard governing materiality which we adopt is not precluded in determining the issue of recovery from applying other criteria laid down in our opinion and found by the trial court to be applicable to the particular transaction.
 
 
 57
 It is so ordered.
 
 
 
 *
 Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation
 
 
 [1]
 The suit was filed by M. P. Gilbert and M. J. Lebsack, anf by A. R. Lebsack and M. J. Lebsack, a partnership doing business as Lebsack Development Company. While Mrs. (M. P.) Gilbert is the real party in interest so far as the record reveals, all of the original plaintiffs have filed a notice of appeal and will be referred to herein collectively as appellants. We do not understand that the Lebsacks, however, individually or as a partnership, assert any rights or sums involved in this appeal separate from those asserted on behalf of M. P. Gilbert, wife of B. D. Gilbert who acted as her agent. If they do the adjustment between appellants must be resolved by the District Court on the remand. Moreover, we hold for purposes of the transactions involved in this case that Lebsack was an agent of the Gilbert appellants, and we base our decision on submissions made by appellee to the Gilberts through Lebsack, except where the nature of such submissions might have been materially altered by independent submissions, representations, or omissions by Lebsack
 
 
 [2]
 See, note 1, supra
 
 
 [3]
 An example of the letter agreement is the following:
 'Mr. M. J. Lebsack, #9 Lee Building, 2133 South Bellaire, Denver 22, Colorado. Re: Ewing 'B' Prospect, SW/4 Sec. 36-19S-15W, Barton County, Kansas.
 Dear Mr. Lebsack: This is to reduce to writing, our agreement whereby I agree to assign 5/8ths working interest in the SW/4 Section 36, Township 19 South, Range 15 West, Barton County, Kansas. This Lease is subject to a 1/32 of 7/8ths overriding royalty to Mr. Galen Ewing.
 You agree to participate in the drilling of an oil and gas test in the NW SW SW of Section 36, T19S, R15W. On the first hole only, you will be charged for 5/7ths of any and all drilling costs to the point of running production casing. You will also be charged 5/7ths of $480.00 which covers the initial lease bonus, title opinion and any and all charges and expenses pertinent to the acquisition of these leases. *363.
 If this sets forth our agreement in this respect, please signify by signing the attached copy and returning it to my office.
 Very truly yours, (s) R. P. Nixon
 RPN:rm
 Accepted: This 4th day of October, 1961.
 Milton J. Lebsack By (s) M. J. Lebsack'
 
 
 [4]
 Securities Act of 1933, 15 U.S.C. 77l(1), 77l(2), 77q; Securities Exchange Act of 1934, 15 U.S.C. 78j and 17 C.F.R. 240.10b-5. The District Court's ruling that Section 77q and K.S.A. 17-1253, note 5, infra, cannot be the basis of an action for civil liability was not appealed by appellants
 
 
 [5]
 Kansas Securities Act, K.S.A. 17-1253 and 17-1268
 
 
 [6]
 Appellants do not contest the District Court's determination that they failed to prove a case of common law fraud. Their arguments in this court relate solely to Nixon's liability under the securities acts, notes 4 and 5, supra
 
 
 [7]
 The net consideration or expense paid by the appellants for their fractional interests in each of the thirteen leasehold drilling ventures in issue, and the combined expenditures of all, were claimed as follows:
 Lease Name Amount
Pendergast $ 16,659.58
Ewing "A" 13,041.47
Ewing "B" 7,519.42
Teeters 10,483.07
Herber 22,586.76
Driscoll 21,243.85
Bowlby 17,740.80
Ginther 20,098.17
Hlad 10,151.26
Brungardt "C" 10,598.50
Snapp 10,214.64
Vogel 14,010.85
Steinert 15,484.83
 -----------
 Total..... $189,833.20
 
 
 [8]
 See also, 15 U.S.C. 78c(10); K.S.A. 17-1252(j)
 
 
 [9]
 See also, K.S.A. 17-1262(m); 17-1268(a)
 
 
 [10]
 Section 78j provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails * * * (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 That Nixon used means of communication in interstate commerce and of the mails, a jurisdictional prerequisite to liability under both Section 10 of the 1934 Act and Section 12(2) of the 1933 Act, is not disputed.
 
 
 [11]
 Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965); Jordan Bldg. Corp. v. Doyle, O'Connor & Co., 401 F.2d 47 (7th Cir. 1968)
 
 
 [12]
 See, e.g., Trussell v. United Under-writers, Ltd., 228 F.Supp. 757 (D.Col.1964); Weber v. C.M.P. Corp., 242 F.Supp. 321 (S.D.N.Y.1965); Drake v. Thor Power Tool Co., 282 F.Supp. 94 (N.D.Ill.1967); 'Negligent Misrepresentations under Rule 10b-5,' 32 U.Chi.L.Rev. 824 (1965)
 
 
 [13]
 Kardon v. Nat'l Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946); Ellis v. Carter, note 11, supra
 
 
 [14]
 In reaching this conclusion we do not mean to say that buyers never have an action under 10b-5 independent of Section 12(2)
 
 
 [15]
 Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), where the Court, construing a private cause of action under Rule 14a-9, 15 U.S.C. 78n(a) of the proxy rules held that a finding of materiality:
 indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote.
 
 
 [16]
 See, List v. Fashion Park, Inc., supra, 340 F.2d at 462-463; Janigan v. Taylor, 344 F.2d 781, 785-786 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 1260 (1965); Myzel v. Fields, 386 F.2d 718, 735 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Trussell v. United Underwriters, Ltd., supra, 228 F.Supp. at 773; Contra, Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 463 (1967). Cf., Mills v. Electric Auto-Lite Co., note 15, supra, holding under the proxy rules that the requirement of materiality is sufficient and need not be supplemented by proof of actual reliance
 
 
 [17]
 Compare Fischman v. Raytheon Mfg. Co., supra, 188 F.2d at 786, with Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962), and SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 854-855; see, also, Stevens v. Vowell, supra, 343 F.2d at 379; Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290-1291 (2d Cir. 1969)
 
 
 [18]
 The trial court did not distinguish materiality from reliance. That the two concepts are distinguishable was fully explained in List v. Fashion Park, Inc., supra, 340 F.2d at 462-463. Whether or not reliance is to be equated with causation, see 'Civil Liability under Section 10b and Rule 10b-5', 74 Yale L.J. 658 (1965) when liability rests upon 10b-5 alone, we have held that the requirement of reliance is not appropriate when relief is properly subject to the provisions of Section 12(2)
 
 
 [19]
 The court found that the amounts billed to appellee coincided with the invoices, which, the court also found, were the normal charges for the services rendered
 
 
 [20]
 The amount of the judgment also included an oil credit of $378.06 which Nixon admitted to be due the appellants
 
 
 [21]
 The 'Reagan Sand,' according to the testimony of Lebsack, is a topical name given to a geological zone so located that it is usually the last opportunity for reaching oil and gas
 The 'Kansas City zone' is a formation underlying the Lansing Limestone. Both zones were frequently referred to by the parties as the 'Lansing-Kansas City.' These geological formations are structurally higher than the Reagan Sand and, insofar as the leases under discussion are concerned, represent an area where oil and gas can normally be expected to be found. The record reveals, however, some uncertainty as to the meaning of 'zones behind the pipe' although the term appears to indicate a potential area of productivity.
 
 
 [22]
 Although the term 'offset' may have other meanings in different contexts, as used in this case it describes a well or proposed drilling site which is in the same oil producing formation as another well or site
 
 
 [23]
 The trial court made no findings with respect to the representation that there were 'four Kansas City zones behind the pipe.' However, we find it unnecessary in the resolution of this part of the case to discuss the matter further. Nor do we need consider other matters such as appellants' claim that Nixon's map showed a producer offsetting the Ewing 'B' well which, unknown to appellants, was producing a high percentage of water
 
 
 [24]
 The record indicates that oil is usually found in a dome-like structure and the taller the dome, the more likely it is that oil can be successfully produced. Thus appellants' assumption that the Herber lease, to be an attractive prospect, must have a Lansing Limestone dome top at least as high as the offsetting producers, has support in the record
 
 
 [25]
 Geological formations, including in this case oil producing domes, are estimated primarily through the use of depths of previously drilled wells, which are called 'control points.'