Hugo **BROOKS, et al., Plaintiffs,**

v.

**LAND DRILLING COMPANY, et al., Defendants.**

Civ. A. No. 82–K–895.

United States District Court, D. Colorado.

Dec. 1, 1983.

James E. Brown, Brian Magoon, Grant, McHendrie, Haines & Crouse, Denver, Colo., for Land Drilling.

James R. Everson, Rothgerber, Appel & Powers, Denver, Colo., for Pate, Pate & McKinney.

Michael Grove, defendant pro se.

Wiley E. Mayne, Jr., Anne J. Castle, Holland & Hart, Denver, Colo., for Energy Capital.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Before me is the plaintiffs' motion for summary judgment on their third and fifth claims for relief. Also before me is defendants Pate, Pate, McKinney and Grove's motion to dismiss the ninth claim for relief. For the reasons expressed in my opinion of June 8, 1983, *Brooks v. Land Drilling Co.*, 564 F.Supp. 1518 (D.Colo.1983), I grant the defendants' motion to dismiss. For the reasons set forth below, I deny the plaintiffs' motion for summary judgment.

### Factual Background

Land Drilling Company, now bankrupt and formerly known as Continental Drilling Services, was incorporated in December, 1981. Its organizers were the defendants Pate, Pate, McKinney, Grove and Energy Capital Development Corporation (ECDC). ECDC is Land's parent corporation and a significant shareholder in Land. To raise initial capital of $580,050, Land sold common stock pursuant to a private placement exemption under § 4(2) of the Securities Act of 1933. Land's attorneys prepared a private placement memorandum and also filed the appropriate claim for a Form E exemption with the Colorado Division of Securities, as required by Colo.Rev.Stat. § 11–51–114(2)(i) (1973), and the regulations promulgated thereunder. Between January 13 and April 16, 1981 a total of 1,301,789 shares of stock were sold at .35¢ per share. All of the plaintiffs, however, tendered checks for their shares between January 13 and March 1, 1981. 6,000,000

Clifford L. Neuman, Boulder, Colo., John Whitehouse Cobb, Boulder, Colo., for plaintiffs.

additional shares were distributed at .01 cent per share as insider shares, to the defendants and a miscellany of others. With their checks plaintiffs also tendered an investor questionnaire and a representation of investment intent letter.

Land was organized as a drilling company to engage in onshore contract drilling of oil and gas wells in the United States with special emphasis in the states of Oklahoma and Texas. The private placement memorandum made clear that purchase of Land Drilling securities involved a high degree of risk. Specifically, it provided that

> [t]he business of the Company is dependent upon its active management and executive officers. The loss of the services of these persons could materially affect the conduct of the Company's business.

Identified as one of the key employees was Jack McBride, the company's vice president and one of its directors. McBride was the only member of Land Drilling's management with any experience operating drilling rigs.

By letter of June 8, 1981, Land Drilling issued the share certificates purchased by the investors. The letter also advised the shareholders that certain changes had been made in the management structure, stock distribution and initial locus of the company's drilling activities. These changes, plaintiffs claim, amount to material untruths or omissions within the meaning of section 12(2) of the Securities Act, entitling them to rescission.

Jack McBride resigned his position as of April 1, 1981 and was replaced by Danny G. Wedding, a "stranger to the private placement memorandum whose identity and qualifications had not been disclosed to any investor [before the letter of June 8, 1981]." Plaintiffs' Brief at 4.

The private placement memorandum contemplated distribution of six million insider shares to the defendants and its organizers. The June letter advised the plaintiffs that the six million shares had been distributed, but in a manner different than contemplated by the private placement memorandum. Persons receiving insider stock were added or deleted, allocations were increased to some persons, and the total cash contribution made to the company was less than had been stated in the private placement memorandum.

The private placement memorandum gave the impression that Land Drilling would limit its drilling to Texas and Oklahoma. In fact, as the letter disclosed, Land's initial drilling activities were begun in eastern Kentucky, on behalf of the parent corporation, ECDC. In addition, the drilling was upon mineral leaseholds in which one of the company's management had an economic interest in the form of an overriding royalty.

Land Drilling learned of McBride's resignation on or about March 17, 1981. At about the same time it altered the insider stock distribution plan. On or about March 25, 1981 the defendants knew that Land Drilling would be drilling in Kentucky, as opposed to Texas and Oklahoma. These dates are significant. They are also undisputed.

Plaintiffs' third and fifth claims for relief seek rescission under section 12(2) and the Colorado Securities Act respectively. The motion for summary judgment raises five issues:

1. What is the critical date for disclosure in an action under section 12(2)? Expressed differently, where is the point before which failure to disclose a material fact may result in securities fraud liability and the point after which rescission will not be permitted?

2. Is the June 8, 1981 letter actionable standing alone under the 1933 Act?

3. Were the changes described above and in the June 8, 1981 letter material?

4. Does the failure to file a sales report as required by the Colorado regulations nullify any claimed exemption under state law?

5. Were the defendants controlling persons, as that term is defined in securities law?

### The Date of Materiality

Accepting for the nonce the materiality of the omissions, all of the plaintiffs tendered funds for their stock before the defendants learned of the misstatements and omissions. I must decide whether this prevents the plaintiffs from rescinding their purchases under 12(2) of the Securities Act.

Plaintiffs argue that basic contract law treats the tendered checks as nothing more than an offer to purchase which the defendants did not accept until the letters of June 8, 1981, which enclosed the stock certificates. Second, they say that under the Colorado Securities Act and relevant regulations, an offering terminates sixty days after the last sale or transaction. *See* Rule 8.16, Colorado Securities Regulations (1977). The last insider purchase was made on April 16, 1981. Thus, the plaintiffs say the earliest possible termination date for the offering would be June 25, 1981. Finally, plaintiffs cite case law from this and other jurisdictions which purportedly holds that delivery of certificates of stock amounts to a "sale" within the meaning of the Securities Act. Since the certificates were delivered in June, they say any material changes took place before the sale was completed. *See Athas v. Day*, 161 F.Supp. 916 (D.Colo.1958).

The defendants argue that the tendered checks constitute an acceptance by plaintiffs of an offer by Land Drilling. More persuasively, they suggest that they accepted the plaintiffs' offer to purchase the securities by cashing and returning the tendered checks. They also say that the Colorado securities regulations do not alter the date of materiality and further that the cases plaintiffs cite stand merely for the proposition that delivery through the mails is sufficient use of interstate commerce to establish jurisdiction under federal securities law.

I do not agree with the plaintiffs' interpretation of *Athas v. Day, supra,* or their interpretation of Rule 8.16 of the Colorado Securities Regulations. The task before me is to determine the point at which the plaintiffs were committed to the purchase of the land securities, as discussed below. It is not whether a sale has been terminated or abandoned within the meaning of the Colorado Securities Act, or whether delivery of certificates through the mail constitutes a sale within the meaning of 15 U.S.C. § 77b(3). I do agree, however, that the transaction of 1981 must be analyzed in contractual terms, but for different reasons than advanced by either party.

In connection with rule 10b–5, other courts have found the critical date for disclosure to be the date on which the purchaser becomes obligated to buy the security. *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 889–91 (2d Cir.1972). The critical difference between a 10b–5 action and one under 12(2) is that under 10b–5 causation-in-fact "appears to be the crux of the action," Kaminsky, *An Analysis of Securities Litigation under Section 12(2) and How It Compares with Rule 10b–5*, 13 Hous.L.Rev. 231, 254–55 (1976), while a 12(2) action requires no reliance— only that the offer or sale be by means of a prospectus containing untruths or omissions. *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971). As the Second Circuit put it in *Radiation Dynamics, supra:*

> The essential purpose of Rule 10b–5 ... is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders.... It was not intended to provide an escape hatch through which disgruntled buyers or sellers could avoid transactions to which they had become committed, but which had not been fully consummated by the formal exchange of the money or the securities agreed upon to be exchanged.

464 F.2d at 890–91.

As I read the cases under *Radiation Dynamics,* the critical inquiry is the point at which the purchaser is committed to purchase the security. "In *Radiation Dynamics* the investment decision was completed at the time the parties entered into the agreement, the contract between purchaser and seller being, in effect, a 'one-shot deal.' " *Goodman v. Epstein,* 582

F.2d 388, 412 (7th Cir.1978). *And see Vanderboom v. Sexton,* 460 F.2d 362 (8th Cir. 1972) (Where purchase option exercised in November, 1965 to January, 1966, events in December could not be the basis of a securities fraud claim on theory that purchase had not been completed until January.)

In *Bolton v. Gramlich,* 540 F.Supp. 822 (S.D.N.Y.1982), the court explained:

> By this standard, a liquidation constitutes a sale. Moreover, the sale in substance occurs when the vote to liquidate takes place, because it is at that point that the nature of the investment changes into a mere right to receive money as between the parties to the sale.... The fact that the completion of the exchange of cash for an investment interest may not occur for many months is irrelevant. *The purchase or sale occurs when the commitment to the transaction is made.*

540 F.Supp. at 839 (emphasis added). *See Also Sec. and Exchange Com'n v. Nat. Student Marketing,* 457 F.Supp. 682, 702–5 (D.D.C.1978).

■ Analyzing the instant transactions by this test, it is clear that the plaintiffs became committed to purchase Land Drilling securities at the moment when

> there was a meeting of the minds of the parties; [commitment] marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the final performance of their agreement is to be after a lapse of time.

*Radiation Dynamics,* 464 F.2d at 891. By its private placement memorandum, Land Drilling offered for sale its stock. Plaintiffs' completion and mailing of the letter of investment intent along with their checks constitutes an offer to purchase Land Drilling's stock. At the moment Land Drilling negotiated the checks, regardless of whether the plaintiffs were aware of the negotiation, see *Landon v. Northern Natural Gas Co.,* 338 F.2d 17, 19 (10th Cir.1964); *Molina v. Largosa,* 51 Hawaii 507, 465 P.2d 293 (1970), the offers to purchase were accepted. Defendant

ECDC's exhibit 3 establishes that all of the plaintiffs' checks were cashed on or before March 5, 1981. The plaintiffs were all committed, within the meaning of *Radiation Dynamics,* as of that date. As such, the obligation to ensure that the private placement memorandum was free from errors, as to these plaintiffs, terminated on the same date.

I have found only one case where a court has imposed a continuing obligation of disclosure after commitment but before consummation of a "one-shot deal." *Aronson v. TPO, Inc.,* 410 F.Supp. 1375, 1379 (S.D. N.Y.1976). Only where the parties contemplate a continuing relationship have some courts imposed a concomitant obligation of disclosure. See *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977); *Wright v. Heizer Corp.,* 560 F.2d 236 (7th Cir.1977); *Goodman v. Epstein,* 582 F.2d 388 (7th Cir.1978).

### *The Actionability of the June 8, 1981 Letter*

■ Plaintiffs argue that the June 8 letter was a prospectus within the meaning of the '33 Act since it not only confirmed the sale of a security but contained material information, in some cases false and misleading, relating to the value of the security. Plaintiffs say they are accordingly entitled to rescission. While I agree that the June 8 letter may be a prospectus—a communication confirming the sale of a security, 15 U.S.C. § 77b(10)—I do not agree that plaintiffs have shown a sufficient causal connection between the sale of the securities and the prospectus.

■ Plaintiffs, of course, need not prove they relied on misleading statements or material omissions in a Section 12(2) action. *Gilbert v. Nixon,* 429 F.2d 348, 356–57 (10th Cir.1970). They must, however, prove that there was "some causal connection between the challenged communication and the sale, even if not 'decisive.'" *Jackson v. Oppenheim,* 533 F.2d 826, 830 n. 8 (2d Cir.1976). *Accord, Austin v. Lofstgaarden,* 675 F.2d 168, 179 (8th Cir.1982). The undisputed facts in the case before me

show that all the plaintiffs had made their purchases by March 1, 1981, well before the June 8 letter. In my view, that letter could not have been "intended or perceived as instrumental in effecting the sale[s]" to the plaintiffs. 533 F.2d at 830 n. 8.

### Materiality

 There is little dispute between the parties about the appropriate test of materiality. Although different courts in different contexts have rephrased the test, it still retains substantially the same meaning. Under *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), a fact is material if a "reasonable" shareholder would consider it important and if that shareholder would consider it as having "significantly altered the total mix of information made ·available." Under *Gilbert v. Nixon,* 429 F.2d 348 (10th Cir.1970), a fact is material if

the misrepresentation or omission was of a fact which, considering appellants as reasonable or prudent investors, would affect or influence them in determining whether to buy the fractional interests.

429 F.2d at 356. Compare *Admiralty Fund v. Hugh Johnson & Co., Inc.,* 677 F.2d 1301, 1306 (9th Cir.1982). Under either of these two tests I cannot say that the changes in management, stock distribution, and the location of Land Drilling's initial operations were material beyond a reasonable doubt so as to make summary judgment appropriate.

Defendant ECDC describes the replacement of Jack McBride by Danny Wedding as the "substitution of one experienced and qualified manager for another." Brief at 23. Both men certainly had comparable if not identical operational experience. *See* Exhibits A and F.

The distribution of insider stock changed, but not dramatically. Some insiders received more stock and several new individuals were added to the list. The total number of shares distributed remained unchanged. Only the amount of capital contributed was reduced—but this only by $400. This is less than 1% of the insider

cash contribution and less than 1/10th of 1% of the total amount contributed.

The prospectus at page nine states:

The Company intends to engage primarily in the business of providing onshore contract drilling services for the oil and gas industry in the states of Oklahoma and Texas, with special emphasis on South Texas.

It also provides, at pages two and four, that Land Drilling was organized

to engage generally in the business of acquiring, owning and operating drilling rigs for domestic onshore contract drilling of oil and gas wells in the United States, with special emphasis upon the states of Oklahoma and Texas.

Given the closeness of McBride and Wedding's qualifications, the minimal changes in the distribution of the insider stock, and the varying language of the private placement memorandum, I cannot say these changes were material beyond a reasonable doubt, and I deny the motion for summary judgment for this reason as well.

### Liability Under the Colorado Securities Act

Plaintiffs admit that summary judgment is appropriate under Colo.Rev.Stat. § 11–51–125(1) (1973) to the same extent as under section 12(2) of the Securities Act of 1933. Independently, plaintiffs also argue that they are entitled to rescission because defendants failed to file a sales report. Rule 8.16 requires such a final report

showing the aggregate dollar amount, units sold and number of beneficial owners of the securities as a result of the offering, within 30 days following completion, abandonment or termination thereof.

Such non-compliance, plaintiffs argue, entitles them to rescind their purchases. In support, plaintiffs cite *Green v. Weis Voisin, Cannon, Inc.,* 479 F.2d 462 (7th Cir. 1973). There, under similar facts, the Seventh Circuit held that failure to comply with the Illinois sales reporting require-

ment gave rise to the purchaser's right to rescind the transaction.

 Defendants have placed before me a letter ruling from the Colorado Securities Commissioner. Although the facts are there presented in the hypothetical, they are those of this case. The letter takes the position that failure to file a sales report would not preclude the applicability of a Form E exemption. It does so for two reasons, but I find only the second reason persuasive and adopt it.

> Our second ground is more fundamental. Rule 8.16 was just that: a *rule*. Much like old SEC Rule 146 and its relationship to section 4(2) of the federal Securities Act of 1933, Rule 8.16 provided a "safe harbor" for issuers seeking some firm ground on the question of whether an offering was non-public. There was a *presumption* that an offering made pursuant to 146 was exempt under 4(2). The same presumption applied as to 8.16 and [Colo.Rev.Stat. § 11–51–] 114(2)(i). However, the presumption did not, and could not, work in reverse. It could not be presumed that an issuer who did not comply with 146 was not in compliance with 4(2) nonetheless, and the same for 8.16 and 114(2)(i).

Although compliance with the sales report requirement would have created a presumption of exemption, non-compliance merely negates the availability of Rule 8.16, not the exemption. The motion for summary judgment is denied on this ground as well.

### Liability As Controlling Persons

 I also deny the motion for summary judgment as to the defendants liability as controlling persons. One of the defenses available in an action under section 12(2) is that the defendants "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." All of the defendants, by deposition, have denied knowing, at the time plaintiffs tendered payment, that Jack McBride would resign; that operations would be conducted in eastern Kentucky; and that

the distribution of insider stock would change. As I said in a recent opinion:

> The controlling person provision contains a state-of-mind condition that requires a showing of something more than negligence to establish liability.

*Noland v. Gurley,* 566 F.Supp. 210 (D.Colo. 1983), *quoting Carpenter v. Harris, Upham & Co.,* 594 F.2d 388, 394 (4th Cir. 1979). Where the defendants' knowledge is at issue, as it is here, summary judgment is inappropriate.

### Conclusion

IT IS HEREBY ORDERED that the defendants Pate, Pate, McKinney & Grove's motion to dismiss the ninth claim for relief is granted, in accordance with my opinion of June 8, 1983.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment is denied.