418 F.Supp. 1149 (1976)
ALTON BOX BOARD COMPANY, a corporation, Plaintiff,
v.
GOLDMAN, SACHS & COMPANY, Defendant.
No. 71-185C(3).
United States District Court, E. D. Missouri, E. D.
June 10, 1976.
*1150 John J. Cole, and Joseph S. von Kaenel, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiff.
Jim J. Shoemake, Guilfoil, Symington & Petzall, St. Louis, Mo., and Sullivan & Cromwell, by Michael M. Maney, Philip L. Graham, Jr., and Charles E. Dorkey III, New York City, for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits following a trial to the Court sitting without a jury.
The instant action arises from the default of the Penn Central Transportation Company of an unsecured note commonly known as commercial paper.
The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, Alton Box Board Company, (hereinafter Alton Box Board) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the City of Alton, Illinois.
2. Defendant, Goldman, Sachs and Company, (hereinafter Goldman, Sachs) is a partnership engaged in the business of investment banking, including the purchase and sale of commercial paper, securities brokerage, underwriting of securities, and other related financial activities.
3. Goldman, Sachs is a registered broker/dealer with its principal place of business in New York City, New York, with branch offices in other major cities throughout the United States including a branch office in St. Louis, Missouri.
4. At all material times, the First National Bank in St. Louis (hereinafter First National) was a national banking association organized under the laws of the United States of America, and doing general banking business in the State of Missouri.
5. At all material times, First National was the agent of plaintiff Alton Box Board in connection with the purchase of commercial paper.
6. At all material times, J. Edwin Sunderland was Vice President for Finance and Administration, and Treasurer of plaintiff Alton Box Board, and had responsibility for Alton Box Board's investments in short-term money market instruments including commercial paper.
7. At all material times, Frank Spinner was a Vice President of First National and was responsible for the operation of the First National Bond Department.
*1151 8. One part of the Bond Department of First National was the money desk operation, which involved the purchase of commercial paper both for the account of First National and for customers such as plaintiff Alton Box Board.
9. Glennon Schultheis was a Vice President of First National in the Bond Department and had responsibility for buying and selling commercial paper for customers such as Alton Box Board.
10. At all material times, Clarence C. Barksdale was a Vice President of First National who had responsibility for First National's relationship with Penn Central Transportation Company with regard to business loans until he was replaced with respect to that function by Charles S. Betz.
11. During late 1969, Charles S. Betz, an Assistant Vice President in the Loan Department of First National, succeeded Mr. Barksdale with respect to responsibility for First National's relationship with Penn Central Transportation Company.
12. The commercial paper market is a sub-sector within the national money market engaged in by banks and corporations to handle their large and recurrent short-term borrowing and investing requirements.
13. The essential function of the commercial paper market is to use temporary surplus of some firms and banks to meet the temporary deficits of other firms and banks to generally smooth the capital flow throughout the money market.
14. Commercial paper is an unsecured obligation which is issued solely upon the general credit of the borrowing corporation.
15. Due to its unsecured nature for the most part only large corporations whose names are sufficiently well-known are able to use the issuance of commercial paper for financing purposes.
16. The issuer of commercial paper typically issues the obligations in varying maturities to fit the cash needs of the issuer, and to provide a readily marketable issue to fit the investment needs of the buyers.
17. Commercial paper is usually sold on a discounted basis. Essentially this means that the price paid by a purchaser is lower than the face amount of the note by the amount of interest at the stated rate.
18. The various discount rates in effect for commercial paper are generally determined by the relative state of the money market as a whole. As a general rule, commercial paper rates will tend to follow the general money market rate with regard to other obligations of corporations and governments. The discount rate may also be affected by the current money market policy of the Federal Reserve Bank.
19. Commercial paper market is a professional market in which virtually the only participants are knowledgeable financial officers of substantial corporations, insurance companies, banks and mutual funds, and others acting with similar professional advice. Commercial paper is rarely sold in units of less than one hundred thousand dollars ($100,000) and the average purchase of commercial paper is approximately one million dollars ($1,000,000).
20. Most commercial paper is sold between the hours of 9:00 a. m. and 12:30 p. m. Eastern Standard Time for delivery and payment that same afternoon. Since delivery and payment of the note must be arranged through an investor's bank, the entire transaction must be completed by 3:00 p. m. Eastern Standard Time when most banks' security delivery windows close.
21. A typical conversation between an investor or buyer of commercial paper and a commercial paper salesman during which commercial paper is sold consumes two to three minutes. The salesman will offer a potential buyer the paper of a number of different issuers which fits the maturity, face amount, and, perhaps the rate requirement of the investor.
22. The speed of the transaction becomes obvious when the amount of money involved is considered. The interest on a note may amount to several hundred dollars for a period of only one day. Considering the fact that one day's commercial paper transactions for the entire market will *1152 range into billions of dollars, the necessity for speed becomes obvious on the part of the investor as well as the salesman.
23. In approximately July of 1969, plaintiff Alton Box Board began making short-term investments in the commercial paper market.
24. These commercial paper investments were usually made to maximize income for monies set aside for debt service purposes or accumulation of funds for specific large capital purposes.
25. On March 31, 1970, plaintiff Alton Box Board purchased commercial paper of Penn Central Transportation Company having a face amount of Six Hundred and Twenty-Five Thousand Dollars ($625,000) with a maturity date of September 30, 1970, for a purchase price of Five Hundred and Ninety-Nine Thousand One Hundred and Eighty-Six Dollars and Twenty Cents ($599,186.20) at an annual interest rate of eight and one-eighth (8 1/8 %) percent with an effective yield of eight and four-eighths (8 4/8%) percent.
26. The individual at Alton Box Board responsible for the purchase was J. Edwin Sunderland, Vice President and Treasurer.
27. The only criteria or requirement employed by Mr. Sunderland was that the commercial paper purchased be rated "Prime" by the National Credit Office (hereinafter NCO) a division of Dun & Bradstreet, Inc.
28. The requirement of a Prime rating by NCO of any commercial paper purchased by plaintiff Alton Box Board was due to a lending agreement between plaintiff Alton Box Board and a primary lender, Aetna Insurance Company.
29. The purchase by Alton Box Board on March 31, 1970, was the tenth commercial paper transaction entered into by plaintiff Alton Box Board.
30. As was the case with other previous purchases of commercial paper by plaintiff Alton Box Board, the March 31st transaction was arranged between Mr. Sunderland and Frank Spinner of the Bond Department of First National. In the case of the Penn Central purchase, Mr. Spinner, himself, also called defendant Goldman, Sachs to order the note in question. This was a slight variation from the usual practice of the past whereby Mr. Schultheis of First National maintained communications with defendant Goldman, Sachs during the selling day.
31. On March 31, 1970, Goldman, Sachs offered to Mr. Spinner of First National a group of commercial paper obligations with the face amount and maturity dates requested by Mr. Sunderland of plaintiff Alton Box Board. All of the commercial paper was rated NCO Prime. Mr. Sunderland of plaintiff Alton Box Board instructed Mr. Spinner of First National to purchase the commercial paper with the highest yield, which was that of the Penn Central Transportation Company.
32. The ultimate responsibility for choosing the commercial paper purchased by plaintiff Alton Box Board rested with Mr. Sunderland. However, neither he nor anyone else at plaintiff Alton Box Board made any credit investigation or analysis with respect to Penn Central Transportation Company or any other issuer of commercial paper. Mr. Sunderland relied upon the Prime rating given Penn Central by NCO, and upon the judgment of plaintiff's agent, First National.
33. The criteria for which First National Bank purchased commercial paper for its own portfolio and account was also an NCO Prime rating. In fact, if commercial paper was rated NCO Prime, no financial statement of the issuer was examined by First National for purchases for its own account and portfolio. Neither defendant Goldman, Sachs nor plaintiff Alton Box Board was aware until after the transaction had been completed that Goldman, Sachs had sold the commercial paper of September 30, 1970, to Alton Box Board.
34. The Bond Department of First National, which was responsible for the mechanics of commercial paper transactions, made no investigation of Penn Central Transportation Company or any other commercial *1153 paper. However, the Credit Department of First National, acting in conjunction with the senior lending officer of the Bank having responsibility for Penn Central was engaged in an ongoing financial analysis of the Penn Central Transportation Company.
35. First National had a significant banking relationship with Penn Central for a period of years. This relationship included the two million dollar ($2,000,000) participation of First National in Penn Central's three hundred million dollar ($300,000,000) revolving credit agreement, along with a one point five million dollar ($1.5 million) unsecured line of credit which was used as a "back-up" for commercial paper. From time to time the First National Bank had also made secured loans to various Penn Central subsidiaries including Manner Real Estate Company and Six Flags Over Mid-America Amusement Park.
36. In connection with the various banking activities described in the preceding finding of fact, First National gathered and analyzed credit information on Penn Central so that it could reach, in its opinion, an adequate credit judgment.
37. This credit analysis included periodic contact with Penn Central management executives, communication with the First National City Bank of New York which was the lead bank for the three hundred million dollar ($300,000,000) revolving credit agreement, maintenance of a credit file consisting of various documents used by lending officers such as financial data sheets, memoranda of meetings between bank and Penn Central personnel, and all annual and quarterly reports of Penn Central, newspaper articles and Dun & Bradstreet and Moody's Investor Service reports.
38. Because of their review of financial articles regarding Penn Central Transportation Company, First National Bank was aware of all significant publicly announced developments regarding the Penn Central Transportation Company.
39. First National Bank was able to obtain financial advice regarding railroad operations due to the fact that it had at least two railroad board chairmen on its own board of directors, and maintained a close relationship with the lead bank for Penn Central's three hundred million dollar ($300,000,000) revolving credit agreement, the First National City Bank of New York.
40. More than one month after the sale of Penn Central commercial paper to plaintiff Alton Box Board, Penn Central requested that First National activate its one point five million dollar ($1.5 million) backup line of credit. As a result of this request, First National lent Penn Central one point five million dollars ($1.5 million), a demonstration that as of that date First National believed that Penn Central Transportation Company was credit worthy.
41. The evidence adduced at trial clearly indicates that First National, acting as agent of plaintiff Alton Box Board, was in possession of substantially the same or the same information that defendant Goldman, Sachs was in possession of regarding the financial condition of the Penn Central Transportation Company.
42. There is no indication within the trial record that indicates that either plaintiff Alton Box Board, or its agent, First National, was induced by any misrepresentation or omission of a material fact made by defendant Goldman, Sachs which caused them to participate in the March 31, 1970 purchase of Penn Central commercial paper.
43. The following colloquy is illustrative of the reliance upon which Alton Box Board's agent placed upon the defendant Goldman, Sachs with regard to the Penn Central Transportation Company:
MR. COLE: Did the fact that they were also acting as dealer [Goldman, Sachs] for Penn Central's commercial paper have been one of the factors that may have lulled you into assuming that the Penn Central was a viable and solvent organization?
MR. BARKSDALE: I don't think anything that Goldman, Sachs did, if that's your question, influenced our decision on Penn Central.

*1154 MR. COLE: I think you indicated that you relied, to a substantial extent, on the lead bank in connection with these two loans that you mentioned, the revolving credit and the fifty million dollar standby.
MR. BARKSDALE: Yes, but that's to be distinguished from Goldman, Sachs.
MR. COLE: Yes, I understand that. Then, I was just asking you the next question  were you also relying upon the fact and lulled in a certain extent by the fact that Goldman, Sachs, the largest dealer in commercial paper, was also handling this account?
MR. BARKSDALE: Right, and I said, No.
(Transcript pp. 501-502.)
44. The plaintiff, Alton Box Board, has failed to produce any credible evidence to show that defendant, Goldman, Sachs was responsible for the continued rating of Penn Central commercial paper as NCO "Prime". There is simply insufficient evidence to prove that NCO relied in toto upon the statements of defendant Goldman, Sachs regarding the credit of Penn Central Transportation Company.
45. After careful review of all the evidence, it is the opinion of the Court that defendant, Goldman, Sachs, was warranted in continuing to assert that Penn Central Transportation Company was credit worthy, and in continuing to sell Penn Central commercial paper.
46. It is clear to the Court sitting as the trier of fact, and charged with the responsibility of assessing the credibility of evidence, that the plaintiff Alton Box Board has developed twenty-twenty hindsight with regard to its purchase of Penn Central commercial paper. All of the information which plaintiff complains was not available to it at the time of the transaction in question was clearly available to plaintiff or its agent, First National Bank. It is simple, human nature to characterize non-material facts as material when a person is faced with an approximate $500,000 loss. This is, in the opinion of the Court, what happened to the plaintiff upon Penn Central's default.
47. Since all relevant information upon which a credit analysis of Penn Central Transportation Company could have been made was available to plaintiff or its agent First National, it is the opinion of the Court that plaintiff cannot be heard to complain that it was damaged by something within its knowledge.
48. Any facts which plaintiff or its agent were not aware of and can be characterized as omissions in information, are in the opinion of the Court not material to the transaction in question, and even if they had been known, the Court is sure that the plaintiff would not have been deterred from continuing with the transaction.
49. The trial of this case and the documentary evidence adduced thereto lead the Court to the inescapable conclusion that plaintiff had a substantial sum of money available to it for short-term investment, and that the plaintiff invested that money in an unsecured obligation having the highest yield available and that there is nothing which defendant could have done which would have deterred the plaintiff from consummating the transaction in question.
50. This conclusion is especially supported due to the quick and volatile nature of the commercial paper market, and in light of the speed with which the transaction upon which this lawsuit is based took place.

Conclusions of Law
The Court has jurisdiction over the parties and the subject matter thereto pursuant to 15 U.S.C. §§ 77v(a) and 78aa, and pendent jurisdiction of plaintiff's state law claim pursuant to § 409.411(a)(2), R.S.Mo., 1969.
The plaintiff has alleged violations of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2) (hereinafter § 12(2)), and § 10 of the 1934 Securities Act, 15 U.S.C. § 78j (hereinafter § 10(b)), and 17 C.F.R. § 240.10b-5 (hereinafter Rule 10b-5), and § 409.411(a)(2) of the Missouri Uniform Securities Act, R.S.Mo., 1969.

*1155 Section 12(2) Claims

Section 12(2) of the Securities Act states in pertinent part:
Any person who 
. . . . .
(2) offers or sells and security (whether or not exempted by the provisions of § 3 of this Title other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care, could not have known, of such untruth or omission,
shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
It is the contention of the plaintiff Alton Box Board that defendant Goldman, Sachs made both misleading statements as well as omitting to make statements concerning the credit worthiness of the Penn Central Transportation Company at the time plaintiff purchased the commercial paper upon which this lawsuit is based.
The omissions of material facts that defendant Goldman, Sachs is alleged to have made concern the projected losses of Penn Central during 1970. It is clear that plaintiff Alton Box Board's agent, First National, was aware of the purported material facts which were alleged to have been omitted by the defendant. The evidence clearly shows that First National was an active participant in the financing of various Penn Central activities, and maintained an active and continuously updated credit file with regard to the Penn Central Transportation Company. The Court is firmly of the opinion that First National Bank was well aware of the projected losses of the Penn Central during 1970, and particularly notes that even after the transaction upon which this lawsuit is based, First National loaned a substantial amount of money to Penn Central Transportation Company. It would be fatuous to say that a large bank such as First National would lend money to a firm that it knew was not credit worthy. The Court also notes that First National's agent, Mr. Barksdale, asserted twice that no actions of the defendant, Goldman, Sachs, induced in any way the actions of First National Bank with regard to financial dealings with the Penn Central Transportation Company.
Section 12(2) has a key phrase which states: "The purchaser not knowing of such untruth or omission." It is clear that knowledge of an untruth or omission will bar any plaintiff's recovery under § 12(2). Chelsea Associates v. Rapanos, 527 F.2d 1266, 1269 (6th Cir., 1975). It is an axiom of the law of Agency that the knowledge of the agent shall be imputed to the principal. Restatement 2d, of Agency, § 276 (1957).
The Court also notes that the information which plaintiff complains was omitted in communications to it was readily available in the normal financial news such as the Wall Street Journal and other financial reporting services. Cann v. Kane-Miller Corp. [current] CCH Fed.Sec.L.Rep. ¶ 95,446 at pp. 99,242-243 (S.D.N.Y., 1976). Since plaintiff Alton Box Board's agent, First National, was clearly aware of the relevant financial condition of the Penn Central Transportation Company at the time which the transaction in question occurred, and plaintiff Alton Box Board should have been aware from public record of the financial condition of Penn Central, the statutory language of § 12(2) regarding knowledge of the purchaser clearly bars *1156 any recovery of the plaintiff with regard to a material omission of fact.
In addition to its contention that defendant Goldman, Sachs failed to make certain statements with regard to the condition of the Penn Central Transportation Company, the plaintiff alleges that defendant Goldman, Sachs made a material misstatement for purposes of liability under § 12(2) by being the cause of the continued "Prime" rating of the Penn Central commercial paper by NCO. Unfortunately, the person who could best testify as to the continued rating of Penn Central commercial paper as "Prime" by NCO, Alan Rogers, NCO's Credit Analyst for Penn Central, died before his deposition could be taken concerning this litigation. Plaintiff Alton Box Board has introduced into evidence certain documents which contain hearsay statements that Mr. Rogers, and NCO would continue to rate Penn Central commercial paper as "Prime" due to the defendant's continuing to sell Penn Central commercial paper. Such statements are clearly admissible as plaintiff contends, as proof of the continued rating of Penn Central commercial paper as "Prime" by NCO. Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). Such hearsay statements, while admissible, are in the opinion of the Court not entirely probative of the future conduct in such a complex financial situation as the one presently at bar. It must be noted that the Hillmon doctrine has been characterized as the high water mark of past statements being used to cast light upon future actions. Shepard v. United States, 290 U.S. 96, 105, 54 S.Ct. 22, 78 L.Ed. 196 (1933). The primary use of Hillmon doctrine statements has been to verify deaths of missing persons, changes in beneficiaries of insurance policies, and amendments of wills and other testamentary documents. 6 Wigmore, Evidence, § 1725 (3rd Ed., 1940). It is the opinion of the Court that since the continuing credit investigation of a large corporation involves a series of complex actions involving a number of people, the evidence of one hearsay statement made by one person is not entirely probative of whether or not the intended action took place. When the hearsay statement attributed to Mr. Rogers is considered along with other evidence regarding the ongoing granting of credit to the Penn Central Transportation Company by various other large financial institutions, such as plaintiff's agent, First National, the hearsay statement pales in significance and importance in relationship to the other direct evidence. After careful weighing of the evidence it is the opinion of the Court sitting as the trier of fact that the plaintiff has failed to prove that defendant Goldman, Sachs was responsible for the continued "Prime" rating of the Penn Central Transportation Company by NCO. To infer from a single hearsay statement that the NCO would retain its "Prime" rating of Penn Central Transportation Company would be to ignore all the other evidence adduced at trial regarding the general financial community's assessment of Penn Central, and would also require the Court to believe that defendant Goldman, Sachs was possessed of a mystical power to hypnotize a corporate branch of Dun & Bradstreet. In short, the contentions of the plaintiff Alton Box Board that defendant Goldman, Sachs made a material misstatement to plaintiff Alton Box Board by causing the continued rating of "Prime" of Penn Central commercial paper by NCO is simply not supported by the evidence, nor by any theory of logical reasoning.
After carefully reviewing the evidence, and the post-trial memoranda of the parties, it is the opinion of the Court that the plaintiff has failed to make a submissible case for the purposes of § 12(2) of the 1933 Securities Act. The evidence is clear that plaintiff Alton Box Board's agent, First National, was aware of the financial condition of Penn Central Transportation Company, and that the plaintiff Alton Box Board should have been aware of the Penn Central's condition. Such knowledge in light of the language of the statute regarding a purchaser's knowledge clearly bars the plaintiff from any recovery with regard to a material omission. As stated above, the Court is also of the opinion that the *1157 plaintiff Alton Box Board has failed to prove that defendant Goldman, Sachs was in any way responsible for the continued NCO rating of "Prime" of Penn Central commercial paper. The failure to prove such a relationship clearly bars any possibility of defendant Goldman, Sachs making a material misstatement of fact under § 12(2) of the 1933 Securities Act. There being no untruth, and no omission beyond the knowledge of the plaintiff or its agent, the defendant shall have judgment with regard to plaintiff's claim regarding § 12(2).
Plaintiff Alton Box Board Company has also alleged that the defendant has violated § 409.411(a)(2), R.S.Mo., 1969. Section 409.411(a)(2) is the Missouri counterpart to § 12(2) of the 1933 Securities Act. Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir., 1970). Since, as stated above, the plaintiff is not entitled to recover under § 12(2), it follows that any recovery under the Missouri statute cited above is also barred.

Section 10(b) and Rule 10b-5 Claims
Plaintiff has also alleged that defendant, by means of statements or omissions of statements, induced the plaintiff Alton Box Board into reliance to plaintiff's detriment and therefore violated § 10(b) of the 1934 Securities Act and Rule 10b-5 promulgated thereto. The defendant has asserted that the commercial paper sold by them to plaintiff is not a security within the meaning of the 1934 Securities Act. It is the opinion of the Court that the commercial paper sold is clearly such a security. Franklin Sav. Bank v. Levy, 406 F.Supp. 40 (S.D.N.Y., 1975).
Section 10(b) of the Securities Act of 1934 states in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange
. . . . .
(b) To use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Rule 10(b)-5 states in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
. . . . .
(a) to employ any device, scheme, or artifice to defraud,
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
The recent decision of the Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) makes it clear that for an aggrieved party to recover under § 10(b) or Rule 10b-5 that "scienter" must be proved on the part of the defendant.
As stated in the findings of fact above, the Court after hearing the evidence finds that there was no action undertaken by the defendant Goldman, Sachs to deceive, manipulate or defraud the plaintiff.
The record indicates that the plaintiff, through its agent First National, made approximately a three minute telephone transaction with the defendant regarding the availability of approximately five hundred thousand dollars ($500,000) in commercial paper with a particular due date that was rated NCO "Prime". The defendant *1158 offered plaintiff several pieces of such paper and plaintiff purchased the paper with the highest yield, namely Penn Central.
The omissions which plaintiff Alton Box Board has alleged that defendant Goldman, Sachs failed to make are with regard to the credit worthiness of Penn Central Transportation Company. As stated above in the discussion of plaintiff's § 12(2) claims, such information was clearly available to plaintiff's agent, First National, and was so widely available to the general public and the financial community, that the plaintiff should be charged with the knowledge of the credit worthiness. Chelsea Associates v. Rapanos, supra, and Caan v. Kane Miller Corp., supra.
The alleged misrepresentation of fact which plaintiff asserts that defendant made deals with plaintiff's contention that defendant Goldman, Sachs was responsible for the continued rating of "Prime" of Penn Central commercial paper by NCO. As stated above, the Court is of the opinion that the plaintiff has failed to prove that defendant Goldman, Sachs was responsible for the continued "Prime" rating of Penn Central commercial paper by NCO.
It is clear from the record produced at trial that what actually transpired between the parties in the commercial paper transaction in question, and what plaintiff Alton Box Board says occurred, are two entirely different matters. The record is clear that the Chief Financial Officer of a corporation which in terms of sales ranks as number 637 among all United States corporations[*] was faced with an investment decision regarding approximately five hundred thousand dollars ($500,000) of plaintiff's money upon which he desired to maximize the plaintiff's profit. The financial officer contacted his bank, First National, a lender to Penn Central Transportation Company, and in approximately three minutes received a series of quotes for various pieces of commercial paper which fit his maturity requirements and were rate NCO "Prime". It is obvious that the chief criteria by which the financial officer chose the investment was the rate of return. Unfortunately, for the plaintiff Alton Box Board, the instrument of commercial paper with the highest return on that particular date was that of Penn Central Transportation Company. What has happened in this lawsuit is that the plaintiff has suddenly developed a case of twenty-twenty hindsight. It is very easy once an action has occurred and gone wrong for the actor to say "if I had only known a little more, I might not have done it". The trial record is clear that the plaintiff or his agent did indeed know all that was possible regarding the Penn Central Transportation Company and its credit rating and in no way did the defendant make any material omission or misstatement of fact regarding the creditworthiness of the Penn Central Transportation Company. The plaintiff and its agent are clearly highly sophisticated investors with large amounts of financial resources available to them and accordingly are charged for the purposes of security litigation with the amount of sophistication appropriate to their role. Chelsea Associates v. Rapanos, supra, and Caan v. Kane-Miller Corp., supra, and Eichen v. E. F. Hutton & Co., Inc., 402 F.Supp. 823, 830 (S.D.Calif., 1975). The plaintiff was not a widow defrauded in a blue-sky scheme, but rather was a sophisticated investor who is now seeking to have the defendant pay for the plaintiff's own mistakes. Accordingly, judgment will be entered for the defendant on all issues.
NOTES
[*] Fortune, July, 1976.