**ALTON BOX BOARD COMPANY,**
Appellant,

v.

**GOLDMAN, SACHS AND COMPANY,**
Appellee.

No. 76–1697.

United States Court of Appeals,
Eighth Circuit.

Submitted April 12, 1977.

Decided Aug. 10, 1977.

Rehearing and Rehearing En Banc
Denied Sept. 1, 1977.

John J. Cole, St. Louis, Mo. (argued), and Joseph S. Von Kaenel, St. Louis, Mo., on appendix, brief and reply brief, for appellant.

Michael M. Maney, New York City, and Jim J. Shoemake, St. Louis, Mo., and Philip L. Graham, Jr. and Charles E. Dorkey, III, New York City, for appellee.

Before LAY, ROSS and HENLEY, Circuit Judges.

LAY, Circuit Judge.

Alton Box Board Company appeals from a judgment of the United States District Court for the Eastern District of Missouri in favor of defendant Goldman, Sachs & Company. On March 31, 1970, Goldman, Sachs, as exclusive dealer, sold a Penn Central Transportation Company short-term, unsecured commercial paper note valued at $625,000 to First National Bank in St. Louis, as agent for Alton, at a discounted price of $599,186.20. The note had a maturity date of September 30, 1970. At the time of the sale, the National Credit Office (NCO), a division of Dun & Bradstreet, Inc. had given its highest rating—"prime"—to the Penn Central notes. On June 21, 1970, Penn Central filed a petition for reorganization under the federal bankruptcy laws. Alton has never received payment on the note.

Alton brought suit against Goldman, Sachs, alleging that at the time of the sale Goldman, Sachs misrepresented the financial condition and creditworthiness of the Penn Central notes and failed to disclose materially adverse, nonpublic information about Penn Central's financial condition, in violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2); § 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240.10b–5; and Mo.Ann.Stat. § 409.411(a)(2) (Vernon Supp. 1977).[1] Alton's claim rests, in part, upon its allegation that Goldman, Sachs' representation regarding the prime rating was misleading in light of undisclosed, allegedly material facts relating to that rating. Alton also contends that Goldman, Sachs made misleading representations that the Penn Central notes were creditworthy and that it had a reasonable basis in fact for the opinion it rendered.

In order for Alton to place liability for its loss on Goldman, Sachs under § 12(2) it must establish that: (1) Goldman, Sachs made a false or misleading statement of material fact or omitted to state a material fact "necessary in order to make the statements, in the light of the circumstances under which they were made not misleading", *University Hill Foundation v. Goldman, Sachs & Co.,* 422 F.Supp. 879, 892 (S.D.N.Y.1976); (2) Alton did not know of the untruth or omission; and (3) Goldman, Sachs knew, or in the exercise of reasonable care could have known, of the untruth or omission. *See Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1128 (4th Cir. 1970), cert. denied, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *University Hill Foundation v. Goldman, Sachs & Co., supra,* at 892. The district court found that Goldman, Sachs made no affirmative misrepresentations and that Alton or its agent, First National Bank, had actual or constructive knowledge of all material information alleged to be omissions.[2] On appeal Alton challenges these findings. We reverse and remand to the district court with directions to enter judgment for the plaintiff.

I.

One basis of Alton's claim is that Goldman, Sachs failed to disclose the following material facts: (1) that the NCO prime rating was based on misleading information that NCO received from Goldman, Sachs: (2) that Goldman, Sachs had recently reduced and placed limitations on its own inventory of Penn Central commercial paper; and, (3) that Penn Central's bank line credit was below that recommended. Alton contends that disclosure of these facts was necessary in order to make any statement regarding creditworthiness of Penn Central notes, in light of circumstances, not misleading.

1. Several other purchasers of Penn Central Transportation Company notes have litigated similar suits against Goldman, Sachs & Company for alleged securities violations. *See, e. g., University Hill Foundation v. Goldman, Sachs & Co.,* 422 F.Supp. 879 (S.D.N.Y.1976); *Mallinckrodt Chem. Works v. Goldman, Sachs & Co.,* 420 F.Supp. 231 (S.D.N.Y.1976); *Franklin*

*Sav. Bank v. Levy,* 406 F.Supp. 40 (S.D.N.Y. 1975), *rev'd,* 551 F.2d 521 (2d Cir. 1977); and *Welch Foods, Inc. v. Goldman, Sachs & Co.,* 398 F.Supp. 1393 (S.D.N.Y.1974).

2. *Alton Box Bd. Co. v. Goldman, Sachs & Co.,* 418 F.Supp. 1149 (E.D.Mo.1976).

Central to the district court's holding is its findings that First National Bank was Alton's agent, and that at the time of the purchase the bank knew the financial condition of Penn Central. The court held that the bank's knowledge, imputed to Alton, barred recovery under § 12(2).

■ Although the plaintiff vigorously contends that the bank was nothing more than a purchasing agent in the transaction, our decision does not require us to pass upon this question. It is conceded that information about Penn Central's financial condition was generally available to both the bank and Alton. However, Alton bases its claim on certain confidential and undisclosed information contained in nonpublic "blue sheets" available only to Goldman, Sachs. It is admitted that neither the bank nor Alton knew of this information at the time of the sale.[3]

Since the record demonstrates that none of these facts was known or disclosed to the bank or to Alton, it is difficult for this court to accept the finding that Alton was barred from recovery because "the purchaser had knowledge of such untruth or omission." However, we must decide whether the undisclosed facts were "material" under § 12(2).

## II.

Goldman, Sachs asserts that the district court was not clearly erroneous in finding that the undisclosed information in the blue sheets was not material. The resolution of this contention involves two basic questions: first, whether the district court viewed the evidence under the proper standard of materiality within the meaning of § 12(2); and second, whether the undisclosed facts were, both as a matter of law and of fact, material.

### A. *Proper Standard of Materiality.*

■ The district court made the following statement regarding the non-disclosed facts:

Any facts which plaintiff or its agent were not aware of and can be characterized as omissions in information, are in the opinion of the Court not material to the transaction in question, and even if they had been known, the Court is sure that the plaintiff would not have been deterred from continuing with the transaction.

*Alton Box Board Co. v. Goldman, Sachs & Co.,* 418 F.Supp. 1149, 1154 (E.D.Mo.1976).

Plaintiff challenges the propriety of this standard for determining materiality under § 12(2). Goldman, Sachs does not attempt to defend it. It is, of course, clearly in error.

The Supreme Court, in discussing the general standard of materiality under § 14(a) of the Securities Exchange Act of 1934,[4] observed: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it

---

**3.** The district court's conclusion that Alton "should have been aware from the public record" of the financial condition of Penn Central and therefore was barred from recovery under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), clearly is not the law. In *Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680 (5th Cir. 1971), the Fifth Circuit stated that "the availability of information elsewhere does not excuse misleading or incomplete statements." *Id.* at 696. Even assuming the bank was more than a mere conduit for Alton's purchase, as Goldman, Sachs claims, neither the bank nor Alton had any duty to investigate beyond its own general knowledge at the time of the purchase.

Goldman, Sachs argues that the district court's references to Alton's knowledge were inserted as a reflection of the universal availability of information about Penn Central and that no plaintiff may shut his eyes to the obvious and then rely on his ignorance as a basis for recovery. It cites a Tenth Circuit case, *Gilbert v. Nixon,* 429 F.2d 348 (10th Cir. 1970), for the proposition that "the buyer-plaintiff has the burden of proving his excusable ignorance." *Id.* at 356. Goldman, Sachs failed to include the very next statement in its quote. That statement is: "On the other hand, the purchaser does not have to prove that he could not have discovered the falsity upon reasonable investigation." *Id.*

**4.** 15 U.S.C. § 78n(a).

important in deciding how to vote." [5] *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). Under this test it is not necessary to prove that disclosure of an omitted fact would have caused a reasonable investor to change his decision. *Id.* Although *TSC* involved a proxy solicitation and a suit under § 14(a), Goldman, Sachs agrees that the test of materiality is the same under all of the securities statutes. *See Gilbert v. Nixon,* 429 F.2d 348, 355-56 (10th Cir. 1970); *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir. 1965), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

Thus, we find that the district court's view of materiality under § 12(2) was based upon an improper application of the law.

B. *Materiality of Non-disclosed Facts, as a Matter of Law.*

We come then to the second question: whether this court can say that the undisclosed facts fail to constitute *as a matter of law,* facts which a reasonable investor would consider important in making the decision to purchase the notes in question. This question depends, of course, upon the circumstances of the case.

On March 31, 1970, First National Bank, per Alton's instructions, asked Goldman, Sachs for the names of companies issuing commercial paper notes rated NCO prime.[6] Goldman, Sachs listed Penn Central as having commercial paper with a prime rating. Alton asserts that in making this representation Goldman, Sachs omitted to state a material fact. The claimed undisclosed, material information is contained in Goldman, Sachs' blue sheet memorandum of February 5, 1970. That memorandum reads, in part, as follows:

> Alan Rogers of NCO called me today to express concern over the sharply reduced earnings announced in the newspapers today. He asked if we were continuing to sell the Company's notes and whether I felt that Penn Central had sufficient resources which could be converted to cash to pay down debt, if necessary. I said that Goldman, Sachs was continuing to sell the commercial paper notes of Penn Central Transportation Company. In answer to question number 2, I suggested that the Company has a number of valuable properties and securities, and that I was certain that something could be worked out should it ever become necessary.
>
> Alan said that as a result of my comments, he would continue to carry Penn Central Transportation Company as a prime name.
>
> JACK A. VOGEL.

Alton claims that the NCO rating was based solely on the above information which Vogel gave to Rogers. The district court found, however, that NCO did not rely exclusively on Vogel's statement in rating Penn Central notes. 418 F.Supp. at 1154.

We find nothing disturbing in the fact that NCO, in rating a company, checked with the exclusive dealer of that company's notes to ascertain its continuing relationship with the issuer and to obtain the company's appraisal of the notes. The

---

5. As the Supreme Court observed in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976):

> [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2133.

The Court specifically eliminated any "might" test because such a test suggested that mere possibility, however unlikely, would be sufficient to show materiality. *Id.* This court had adopted a "might" test for materiality in *Missouri Portland Cement Co. v. H. K. Porter*

*Co.,* 535 F.2d 388 (8th Cir. 1976), stating: "The applicable test for whether a misrepresentation is material is whether a reasonable investor *might* have considered information to be important in deciding whether to accept a tender offer." *Id.* at 393 (emphasis added).

6. On February 4, 1970, Penn Central publicly released its 1969 fourth quarter and preliminary year end earnings. That release showed earnings on a consolidated basis of $4 million, as compared with $90.2 million the year before. The railroad alone had an operating loss of $56 million. The loss for the fourth quarter was $13.2 million.

fact that NCO called Goldman, Sachs and expressed concern was not, standing alone, a material fact that Goldman, Sachs had to disclose.[7] We agree with the trial court that Vogel's self-serving comment, "based on what I told him," is not deserving of an inference that the NCO rating was based solely on his statement.

Even assuming Vogel's comment to NCO to be in good faith, as the trial court found, Goldman, Sachs' representation to NCO that it would continue to handle Penn Central commercial paper must, nonetheless, be viewed in light of Goldman, Sachs' drastic change of position concerning its handling of the railroad's notes, and its attitude relating to Penn Central's true earning picture. Although Goldman, Sachs told NCO it would continue to offer the paper, on February 5, immediately following Penn Central's announcement of its $56 million loss, according to its confidential blue sheets, Goldman, Sachs attempted to have Penn Central buy back its entire $15 million inventory of Penn Central notes. On February 9, 1970, Penn Central did buy back $10 million of its notes from Goldman, Sachs. Goldman, Sachs then placed a limit of $5 million on its future Penn Central inventory. Although Goldman, Sachs asserted at trial that it had legitimate business reasons for the inventory reduction, we find it significant that on March 23, 1970, in another confidential blue sheet, Robert Wilson of Goldman, Sachs noted his conversation with Penn Central's financial vice-president, John O'Herron:

> Regarding the amount of Penn Central Transportation's [commercial paper] GS&Co. was prepared to inventory at any one time, his recollection of the February 6th luncheon was that no decision had

been reached and that both the $5MM and $10MM figures were still under consideration. I told him that was not my understanding and that, in fact, GS&Co. felt that a $5MM ceiling was appropriate until such time as they obtained 100% line coverage, completed some of these long-term financings, and started to reduce the operating losses.[8]

We have difficulty isolating what Vogel told NCO from Goldman, Sachs' decisions to reduce inventory and to issue Penn Central notes on a "tap only" basis, whereby it would no longer bear any risk.

■ The important implication here is not what NCO might have done had Goldman, Sachs' inventory decision been fully revealed to NCO but that the half-truth which Goldman, Sachs told NCO, at least in Goldman, Sachs' opinion, had *some* significant bearing on the NCO investigation. Goldman, Sachs knew at the time that its position with regard to handling Penn Central notes was undergoing a drastic change. This fact, coupled with Goldman, Sachs' nondisclosure of the information to the bank on March 31, 1970, cannot be said, as a matter of law, not to have been material to a reasonable investor. *Cf. Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1970); *Dale v. Rosenfeld,* 229 F.2d 855 (2d Cir. 1956).

C. *Materiality of Non-disclosed Facts, as a Matter of Fact*

Whether the conversation with NCO and Goldman, Sachs' inventory decisions were material as a matter of fact depends on the inferences a finder of fact might draw, under all the attendant circumstances, using a proper standard of materiality. De-

---

7. Jack Vogel's statement to the National Credit Office (NCO), in light of the evidence developed in *University Hill Foundation v. Goldman, Sachs & Co., supra,* was found by Judge Lasker *as a matter of fact* not to have been material to the transaction. *See* 422 F.Supp. at 897. It is further noteworthy that in a suit against Dun & Bradstreet, Inc., filed by a purchaser of Penn Central notes, the district court, Judge Tenney, was confronted with detailed evidentiary proof that the NCO rating was not based upon an

inadequate investigation and NCO did not rely solely on Vogel's statement. *See Mallinckrodt Chem. Works v. Goldman, Sachs & Co.,* 420 F.Supp. 231 (S.D.N.Y.1976).

8. Also unknown to the bank and Alton at the time of the purchase was the fact that in February 1970 Penn Central officially advised Goldman, Sachs that additional bank-line coverage for its commercial paper was no longer available to them.

fendant contends that its motives in reducing the inventory were proper and that it should not be compelled to disclose facts from which a purchaser could infer an improper and untrue motive.[9] Arguably, this is a legitimate defense which a trier of fact might find convincing. On the other hand, considering all of the circumstances, whether there existed a substantial likelihood that a reasonable purchaser would have considered the omitted facts to be important in making the decision to purchase is still a genuine issue. This is especially true where there was testimony from sophisticated institutional purchasers that these facts would have been important to them.[10]

The Supreme Court observed in *TSC Industries, Inc. v. Northway, Inc., supra*:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

426 U.S. at 450, 96 S.Ct. at 2133 (citations omitted) (footnotes omitted).

In our judgment, whether the undisclosed facts were material is a question to be decided by the trier of fact under the principles discussed here. Ordinarily, we would remand for further findings. However, in view of the record and evidence on the remaining issue, we find that the plaintiff is entitled to judgment on its complaint.

### III.

Alton's second claim is that Goldman, Sachs represented the Penn Central notes it was selling as being creditworthy, and that it had an adequate basis in fact for making that representation. Alton claims that on March 31, 1970, the time of the sale, these representations were misleading.

■ It has been generally acknowledged in all of the cases involving similar facts that when Goldman, Sachs sold Penn Central notes that Goldman, Sachs impliedly represented the notes were creditworthy and of high quality. *See, e. g., Franklin Savings Bank v. Levy*, 406 F.Supp. 40, 46–47 (S.D.N.Y.1975); *Welch Foods, Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393. Similarly, it has been found that by holding the notes out as being creditworthy, Goldman, Sachs represented that it had made a thorough investigation on which it based its recommendation. The latter proposition has strong support. *See Hanley v. Securities & Exchange Comm'n*, 415 F.2d 589, 597 (2d Cir. 1969). *See also Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1069–70 (7th Cir. 1975), *vacated and remanded on other grounds*, 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976). This overall responsibility is perhaps best explained by the Second Circuit in *Franklin Savings Bank v. Levy*, 551 F.2d 521 (2d Cir. 1977), where, in

---

**9.** The Second Circuit holds:

> The investor . . . must be permitted to evaluate overlapping motivations through appropriate disclosures, especially where one motivation is economic self-interest.

*Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1970). *Cf. Dale v. Rosenfeld*, 229 F.2d 855 (2d Cir. 1956).

**10.** J. Edwin Sunderland, vice-president for finance and administration and treasurer of Al-

ton, testified that this information would have been a "red flag" to him, and had he known of Goldman, Sachs' inventory decisions, he would have wanted notes from another issuer. Similarly, Frank Spinner, a vice-president of First National Bank stated he would have been concerned about such information and would have conveyed it to his customers, because it indicated that Goldman, Sachs did not have confidence in Penn Central notes.

describing Goldman, Sachs' duty under circumstances similar to those here, the court observed:

> [Goldman, Sachs] was a professional vendor admittedly recommending this paper for sale to an institution authorized by statute only to invest in prime paper. Such an undertaking implies that Goldman, Sachs had conducted an *ongoing* investigation of Penn Central's financial condition. *If Goldman, Sachs failed to exercise reasonable professional care assembling and evaluating the financial data, particularly in view of the worsening condition of Penn Central, then its representation that the paper was credit worthy and high quality was untrue in fact and misleading no matter how honestly but mistakenly held.* This view does not render Goldman, Sachs an insurer as appellants claim—liable for some catastrophe beyond its control. Rather, it in fact makes the dealer responsible to Franklin if it is unable to shoulder the burden of establishing that it was not reasonable for it to have determined on March 16, 1970 that the quality of the paper it was purveying was less than that represented.

*Id.* at 527 (emphasis added).

We adopt this statement as a proper construction of § 12(2).

The Second Circuit remanded the *Franklin Savings* case to the district court with directions to address the issue of the reasonableness of Goldman, Sachs' determination that Penn Central notes were creditworthy, and to conduct further evidentiary hearings, if necessary, to make that determination.

▪ In the instant case, the trial court made no specific findings as to whether the defendant carried its burden of establishing that it was reasonable for it to have represented, on March 31, 1970, that the Penn Central notes were creditworthy. The record demonstrates that the court apparently determined that Goldman, Sachs had no duty to further investigate the creditworthiness of the notes. The trial court made the following comment during the proceedings:

> . . . I don't know of any rule or reason that would require Goldman, Sachs—and if there is I want to have it in your briefs, gentlemen—that would require Goldman, Sachs to go running down to Penn Central and say: Look, what is going on . . .

Unlike the *Franklin Savings* case, here the defendant does not claim that the trial court precluded it from developing further evidence material to the overall issues. In the instant case the record presents a factual picture similar to that developed before Judge Lasker in *University Hill Foundation v. Goldman, Sachs & Co.,* 422 F.Supp. 879 (S.D.N.Y.1976). Judge Lasker made detailed findings with regard to Goldman, Sachs' credit investigation proceedings and found its defense in support of its investigation of Penn Central unacceptable. He concluded that on the date of sale involved in that case (March 13, 1970) there were sufficient "storm warnings" of Penn Central's unsecure condition to render Goldman, Sachs' normal investigating procedures inadequate and to require more concrete verification of management representations and projections. He found that the major point was not what Goldman, Sachs would have learned had it investigated Penn Central's financial condition more thoroughly, but what it should have done to discharge its duty to make reasonable inquiries and to insure that the representations that it did make were true. *Id.* at 904.

There is a significant difference between the facts in *University Hill* and those existing on the present record, however. University Hill's purchase of Penn Central paper from Goldman, Sachs occurred on March 13, 1970, 18 days before Alton's purchase, and 11 days before Goldman, Sachs knew that Penn Central earnings for the first quarter of 1970 would look "terrible." The earning prediction was contrary to what Goldman, Sachs' officials had learned from Penn Central officers in February. On February 6, David Bevan of Penn Central had predicted that the railroad losses for the year 1970 would again bottom out

at $56 million, approximately the same as in 1969. However, in April the railroad reported a $62.7 million loss for the first quarter alone. This loss was easily predictable on March 23 when Penn Central "reluctantly" advised Goldman, Sachs of the bad news concerning its first quarter earnings. The record here unequivocally shows that even with that additional news, Goldman, Sachs conducted no further investigation before it sold Alton the Penn Central note.[11]

Under the circumstances the record makes clear that Goldman, Sachs did not, as a matter of law, shoulder its burden of proving that it was reasonable for it to have determined, on March 31, 1970, that the Penn Central notes it purveyed were creditworthy and of high quality. In fact the record shows it assumed no burden at all. Therefore, we are led to the conclusion that Goldman, Sachs' representation that the Penn Central notes were creditworthy was misleading, and Goldman, Sachs thereby violated § 12(2) of the Securities Act of 1933.

## IV.

■ Defendant contends that there was no showing that plaintiff relied on its representations either that the Penn Central notes were creditworthy, or that it had made an investigation. Goldman, Sachs claims that Alton, through the bank, relied solely on the representation that the notes were "NCO prime." The district court agreed with defendant's contention. This misconceives § 12(2). To recover under that section a plaintiff need not prove reliance;[12] however some causal relationship between the misleading representation and the sale must be shown.[13] As we have

indicated, the record is undisputed that Goldman, Sachs failed, from March 1 to the date of the sale, to further investigate the creditworthiness of the Penn Central notes. We are satisfied that these facts establish, as a matter of law, sufficient causal relationship between Goldman, Sachs' violation of the Act and Alton's injury. *Cf. Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

■ Plaintiffs have also based their claim on § 409.411(a) of the Missouri Securities Law. The substantive provisions of that Act are identical to § 12(2) of the Securities Act of 1933. We find Alton is also entitled to judgment under the Missouri Act, which provides for 6 percent interest from the date of payment, costs, and reasonable attorney fees.

The judgment for the defendant is vacated and the cause remanded with directions to enter judgment for plaintiff for the amount of its claim, with 6 percent interest from the date of payment, costs, and reasonable attorney fees. Upon remand to the district court, that court should assess reasonable attorney fees under the Act.[14]

---

**11.** It is interesting to note that Goldman, Sachs' inventory of Penn Central paper was reduced to zero by April 7, 1970, some two weeks before Penn Central first quarter losses were made public.

**12.** *See Hill York Corp. v. American Int'l Franchises Inc.*, 448 F.2d 680, 696 (5th Cir. 1971); *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974).

**13.** *See Jackson v. Oppenheim*, 533 F.2d 826, 829–30 (2d Cir. 1976).

**14.** In view of our holding it is not necessary to pass on the district court's dismissal of Alton's claims under § 10(b) of the Securities Act of 1934 and Rule 10b–5.